Good morning, Your Honors. I'm Jack Juergens. I represent Appellant W&T Offshore, Inc. This case involves a resolution of a contractual indemnity dispute between W&T Offshore and Triton Diving Services. The contractual indemnity provision at issue obligated each one to indemnify the others for claims brought by that party's invitees. The court below rewrote that contractual provision to add in some type of verbiage to say that the party can only be the invitee of one of the parties. That language is not in the contract. It is in many other contracts that this court has considered, where the contractual documents recognize the potential that an individual could be the invitee of both parties. And that was the case in Lewis v. Glendale, Blanks v. Mirko, and Terry v. Rebstock, all cited by the district court. You agree that we're applying the Maritime case? We're applying the blank rule? Yes, Your Honor. Absolutely. Absolutely. You apply the blank rule. And if you look at the indemnity allocation provision, because that contract recognized the possibility in the correct factual situation that someone could be the invitee of both. And in that situation, the contract said, okay, if he's the invitee of both, the contractor takes it. Unfortunately, in our case, we didn't have an allocation provision in the contract. However, the trial court added one to the detriment of my client. Now, having made that determination, that contractual interpretation in which, and if you look at the contract, and if you look at what the district court said, and let me just point that out, the court said, this is what the court said about the language of the indemnity provision. The language of the MSC contemplates the person's working on W&T's pipeline recommissioning project will be classified as either members of the W&T group or as members of the contractor group, depending on whether they were the invitees on the worksite at W&T or Triton. Where in the contract does it say either? It doesn't. That word was added. And if we go a little further into the opinion, the court says, the court finds it would be absurd to conclude that in such a situation, there are two invite tours, since this would eviscerate the indemnity provision of a contract. Well, that's exactly what it did in this fact pattern. And I'm going to need to, unfortunately, get into that fact pattern to explain how this is kind of a unique, unique situation. So, the court says, there can only be one invite tour. I'm picking W&T to be the invite tour. And we challenge that the court thought that he could only pick one and not two that he's in error, but that he otherwise proceeds to choose them on a way that's factually supported. What do we do with that? Well, I think when you've got an error of contractual interpretation, it's an error of law and it's reviewed de novo. But even if you review it on clear error, it is clear error. I was suggesting to you that if we concluded that we disagree with the district court that they cannot have circularity in virtually all setting indemnity provisions, but otherwise, the factual findings that he makes with regard to membership in Group A and Group B invitee and flying blank supports the result that it reached as to the status of this particular service company. Then, if that were the case, then you could reach that result. But I think if I'm allowed to go through the facts and you understand why, after the court made that invite tour, he then says, well, it's W&T's pipeline, ergo, it's benefited the most, and says W&T's the invite tour. Well, then it's like after that, well, I've already decided there can only be one invite tour. But just in case, let me go through a perfunctory analysis, tell you why Triton is not an invite tour. And just if I may go back, where I challenged the finding that W&T qualifies as an invite tour, it's because W&T did not time chart this vessel. It did not have a proprietary interest in this vessel. If Triton, W&T contracted with Triton to do a specific part of this pipeline job. As I understand it, W&T's man on board, insofar as this particular operation is concerned, bringing on the Tiger employee, Grogan, that he is really dictating the, he's running the show as to that, or not? No, that is not accurate, Your Honor. And as I said, if Triton wanted to take this boat off of the job, they had every right to do so. It was not a time charted situation. They contracted to do a job, they selected, they said, we're going to put this boat on it. They could have taken it off if they wanted to. The boat, the Triton Achiever, was crewed, manned, managed, captained, everything by Triton. When Mr. Grogan, after we had this event, and just to jump ahead, they're doing the filtration services on the back deck of the vessel. And while they're doing those filtration services, which Triton is doing, it generates H2S. Grogan, was he a diver that was going to go down and bleed the hydrogen sulfide out, or was he? No, Your Honor. But he was going to be on board with those bleeding services, doing his work on deck. What he did was, after, on December 1, Triton's flushing, they're flushing the pipeline, and all these fluids are coming up onto the back deck of the Triton Achiever. And they separate, they purify the water, so, and according to the EPA, so sand or silt can be dumped overboard. They save the refuse, the pollutants, the oil residue, to take it in ashore. When you're doing this, when you're, when you're flushing a pipeline, sometimes you've got, you've got old oil in there that's been eaten up by bacteria, and it generates H2S. And that's, that, that was part of what Triton was, had to be on the lookout for. They had, they contracted with an outfit called Siemens to provide the filtration services. December 1, Siemens says, hey, we're getting a lot of, we're getting a lot of H2S gas, people could get killed. So Triton, Triton shuts the job down. And Triton says, they're not going to come back out to do the, to complete the work unless additional, additional safeguards are provided. And what they said was, let me see, Triton's dive supervisor shut the job down on December 1 because of the H2S danger. At that point, Triton's project manager, David Grady, ordered the Triton Achiever to go leave 1,279,000 and go back to shore. That wasn't W&T doing that. We don't disagree with it, but they had the proprietary interest in the vessel. They controlled it. After that, Triton said, hey, there's danger out here. We're not going to come back and do the work unless we have enhanced H2S monitoring, protection, and training on the Triton Achiever. And that meant having the Triton crew fit. Yes, sir. I got, I thought I read the brief to say that W&T actually elected to bill directly, to pay directly, Tiger, so they could save that 10 percent, which would, which, in other words, if they went through, back, back through Triton, if Triton billed Tiger, paid Tiger, and, in other words, the invoice went from Tiger to Triton, they would just only add 10 percent. And so they saved that and paid directly. But doesn't that fact, that, doesn't that bear on the relationship between W&T and Tiger that suggests the support of that finding, that, a finding that, that, that they would, that, that Grogan was W&T's invitee? Your Honor, if the contract said we indemnify each other for claims brought by our contractors and our contractors' employees, I would agree with you. If we, we, W&T wanted to pay Tiger directly to save that 10 percent. But why are they doing that? Why are they, why are they paying it directly if they're not the, if they're not calling, if they're not the one that really has the relationship directly with Tiger? Well, if you look at, if you look at the test, the test for invitee is one who receives an express or implied invitation onto premises from one deemed to be an occupant on the business of the occupant or for their mutual, mutual advantage. The guy that, the company that's paying for it seems pretty strong evidence that they were writing the check for it, that they're the ones that are beneficiaries of it, et cetera. And the other side agrees with that and doesn't take 10 percent. Your Honor, Triton was not coming back to do the work unless Tiger provided these services. And I, I, I just want to, I had this, and it's, it's in the record, page 1265. This is an email that was written by one of, Triton's project manager, David Grady. And what he says is, and this, I'm glad you brought this up. Mr. Grady of Triton says, I will have . . . I see the chart, but . . . I'm just going to, I'm just . . . I know this is kind of a waste here. You can't read it that far away. Yeah, read line four or something else. All right. I will have H2S equipment and a trainer at the dock for noon tomorrow to start the training. He will have, because it was essential, they weren't going back out there without, without Tiger providing those services. The district court determined that was just logistical coordination. I mean, that that's not them expressly or impliedly inviting. That that's just being courteously, logistically coordinating kind of the, the ins and outs because people are coming aboard. I mean, that, that, that doesn't mean it's for the benefit of them. Well, Your Honor, there was no, the district court said there was no benefit to Triton. This is, this is very important. The district court, and it was like kind of trying to support the contractual interpretation as a backup in case that was wrong. And what the district court said was, well, even if, if Tiger's work did benefit Triton, it really didn't benefit Triton because Triton could have sent the boat off on another job where there's no H2S problem. Where was, there was no evidence of any available other job. But it always could. It's not tied to the, to this particular project. It's for hire, I mean. And there's no evidence, there's no evidence of a job that was available to it? Well, it could have gone back to the port. I mean, the point was it didn't have to stay there. I'm, I'm sorry? I said it could have gone back to port. The point was it didn't have to stay there. If it went back to port, it's not getting paid. But it could get, go with somebody else. But where is the somebody else? It doesn't matter. It just means that this particular job working with the H2O really doesn't help it. It just helps WT get their job done. But, but the Achiever is for hire. But there was no evidence of any other work that was available? That doesn't matter. It's, it's just that. Do you have any evidence in the record that Titan invited Tiger expressly or impliedly? And you may say you don't have to if you can show benefit. But do you have any evidence that there was an express or implied invitation other than this logistical coordination? Well, yes, Your Honor. Just one second. Okay. Triton would not go back on the job unless the Triton crew was fitted with self-contained breathing apparatus. And this is from Mr. Trashel's testimony. Without having compressed air cylinders with manifolds positioned on the back deck of the Triton Achiever, so the Triton crew could access oxygen if H2S was encountered. He would not go back out without H2S training and certification for everyone who'd be on the Triton Achiever. And he would not go back out there unless there was enhanced monitoring for H2S provided by a third party installing monitoring equipment on the Triton Achiever. All of that was done by Tiger. And, and I know this is another thing that you're not going to be able to read, but this is the procedures. This is Triton's procedures. It's a record of page 1210. This is Triton's procedures that it prepared after December 1, after the H2S event. And if you look at— Mr. Juergens, keep near that mic. I'm sorry. They're recording your presentation, so yes, sir. And, yes, sir. Step 14. During this operation, a Tiger safety personnel will be monitoring for H2S. That was Triton's procedure. I mean, I don't know how much more of an invitation that you need. They needed these. They were not going back to work without these things. Their procedure after, after December 1, after the H2S event says, hey, we're going to have, in our work, we're going to have Tiger doing the monitoring and doing these other things. That is an invitation. I mean, we're not going back without you. And another thing I'd like to mention, when Mr. Grogan and Tiger came on the boat on December 7—and this is from Mr. Trashel's testimony—Mr. Trashel operated the Achiever's crane to load all the Tiger's equipment on the vessel. He determined where it would be positioned, and he had the authority to stop him from getting on the vessel if he didn't want him to get on. Now, I don't see how you could have much more of an invitation when you accumulate all of these facts. Counsel, you've exceeded your time. Oh, I'm sorry. You've saved some time for questions. Good morning, Your Honors. Kay Tennyson, representing Triton Diving Services, Appellee. Your Honors, this Court first addressed the issue of invitee status in the context of an oil and gas indemnity agreement back in 1983. I think one of the quotes by Judge Wazansky in that particular . . . in Mills v. Zapata, is particularly pertinent to this case. Judge Wazansky noted that it is preposterous for Louisiana casing to argue that the indemnity agreement is ambiguous. The agreement fits like a French glove, as any wearer would know. It covers an invitee, which all parties agree Zapata was, even if he is also a contractor, which all parties agree Zapata also was. The opposite contention is frivolous. Anyone who has had a French or even a Louisiana relationship knows one may be an invitee and a contractor simultaneously with the same person. Since then, there have been about 10 cases, I think, that involve invitees in an oil and gas indemnity context. I think the overreaching principle that comes out from those cases is that a contractor of a party is that party's invitee. Invitee might be broader. It can include other people, but certainly if you are a contractor of a party, you are that party's invitee. I think that's exactly the situation that we have here, where I think that Tiger Services most certainly was the contractor of W&T. When you look at the factual finding by Judge Hanna on this particular point, the facts indicate, of course, that this was a multiparty, multifacility project in that it involved two separate pipelines owned by different parties. There were different platforms owned by different parties. There was a partner of W&T, Gomex, who had an interest in one of the pipelines. There were two separate vessels hired for work on this job, that being Triton, who provided the Achiever for diving services, and Odyssey Marine, which provided the Odyssey Diligent. There is a . . . I think all of those things comprise the worksite in this case, and it was undisputed that W&T was in charge of the overall operations, even though it involved multiple parties. I think it's also undisputed that the discovery of H2S was not something that any of the parties had anticipated at the outset of this job. W&T provided quite a detailed request for proposal that set forth the various operations that would be involved. That does not address H2S, and W&T's representative candidly admitted they did not expect this to be an issue. Hence, Triton did not address that in its proposal, and it wasn't addressed in any of the contractual documents. The H2S was detected incidentally when Siemens, the water treatment company that was filtering the water so that it could be dumped overboard in accordance with applicable regulations, Siemens was monitoring discharges primarily for LELs, another substance that they were concerned about. In doing that, they happened to be using a four-part monitor that had H2S capability, and that's how they detected the H2S. So H2S, and there is no dispute, is a deadly substance, and when it's detected, it requires action. So the notion that Triton shut down the job as if this was some rogue decision by Triton I think is misleading because it is a substance that had to be addressed. The manner in which it had to be addressed is not something particular to how Triton wanted it done. It is, in the words of Mr. Trashel, who was the Triton dive superintendent, this is not a Triton standard. This is a Gulf of Mexico standard. So this whole procedure was not something unusual that Triton orchestrated here, and I think when you look at the facts once the H2S was discovered, I think it's exceedingly well supported that W&T was the party who brought Tiger onto this work site. Of course, W&T got a bid from Tiger. W&T had a prior relationship with Tiger and wanted Tiger to provide these services. Mr. Grogan testified that he had done numerous jobs previously for W&T and never had worked for Triton. W&T used an AFE purchase order number for Triton. What if there's some evidence that Mr. Grogan was the invitee of both of the companies? I don't believe so because I think . . . But what if there is? That's just hypothetical. Hypothetically. Hypothetically, could there be a co-invitee? I think in a very theoretical sense, potentially so. I don't think that's what the record shows in this case because . . . Let's say, hypothetically, there is. What do we do? Well, I think . . . I mean, if you reach that conclusion, which the trial court factually did not, then I think you have to look at the contract, this particular contract, that I think envisions a situation where a party is an invitee of one or the other because it does not . . . The same as if a contract would say you're contractors or subcontractors. I think that the intent of the parties is that there is a single party who is the implied consent by . . . Do you think the term invitee is used in a more colloquial sense instead of the strict legal sense or not? In the contract? Yes. I think it is probably used in a colloquial sense. I think that it . . . I think in the contract, there are a few calls to be brought onto the worksite, and I think in that respect, it is important to note the contractual definition of invitee in the context, not just in general, but in the context of invitee on the worksite. I think that ties into the fact that this worksite was not just the Triton Achiever. The worksite was this entire project that W&T was in charge of, so I think . . . Everybody on the big worksite was an invitee, weren't they, of somebody? I think that is probably so, but I think what you have to . . . That is true in a general sense, but I think in this particular case, you're looking at invitee status of the three parties who were involved, so it's Tiger's status vis-a-vis W&T and vis-a-vis Triton. Are we looking at invitee, licensee, trespasser? I mean, that's what I'm trying to get at. Well, that's an interesting comment because, in fact, the Fifth Circuit addressed that issue in the Blanks case, so I'll spend just a few minutes, if I can, talking about why I think that case is a significant decision that I think guides the court in this case. In Blanks, and granted Blanks was a Louisiana land-based case, right? It was a land rig in Natchitoches, I believe. The court starts out with the premise that invitee status is determined not so much by a technical definition, but really who the party is who does the inviting. I think that, to me, the court in that case made it quite clear that we're not going to get bogged down into a lot of necessarily a formulaic rule, but you look at who did the inviting, and in Blanks, the analysis by the court was similar to what I was talking about earlier, that A&R, the operator, hired this company and paid their bill and signed their daily work tickets and supervised their work on the job site, and, hence, A&R, the operator, was the invitor. Now, the court did take some time in Blanks to distinguish a Louisiana third circuit decision that involved the invitee trespasser issue because, of course, in Blanks, one of the significant arguments was that, well, we know A&R contracted with this service company, but at the time of the incident, the plaintiff was assisting the analysis, and the court said, in looking at the trespasser invitee issue, the court specifically said, we don't have to account for Blanks' presence on the drilling site because he was already an invitee of A&R. So I think when you look at the Blanks test, certainly the inquiry was that the contractor, the service company, was the contractor of A&R, and, hence, its invitee, and, thus, the court didn't have to go further in looking at its presence on the Blanks drilling site, either as an invitee, trespasser, permittee, et cetera, and I think that's the same analysis in this case. Certainly, I don't think there is any express or implied invitation to Triton . . . I mean, to Tiger by Triton. I think there was but in terms of the act of doing the inviting, it was W&T from the point of saying we want to use Tiger to getting the purchase order to dictating how and what equipment was sent out to dictating how the number of people who were on the job site and when that number was reduced and when the people were sent in. It was evidenced by the actions of the W&T company man who, Judge Higginbotham, you indicated, was certainly the man in charge. The evidence indicated that Mr. Grogan took samples when Mr. Arnold told him to. He gave the samples and the results to Mr. Arnold. Mr. Arnold signed his time tickets, and Mr. Arnold ultimately decided when he would be dismissed from the job. So I think all of those facts certainly indicate that Tiger was the invitee of W&T. I'll take just a minute, if I can, to address the arguments by W&T on the issue of occupancy. W&T tries to argue that because they did not time charter the vessel, they can't be the occupant, and I think that is certainly not the state of the law. The term occupant means one who has a possessory interest in or control over, and I think in this case, all of the things that I've discussed before certainly indicate the control by W&T, not just of the movement of the achiever on this job, but of the overall job site. And in that regard, I think it is important to note that the W&T request for proposal does in fact dictate where the vessel would go and what the order of events would be in terms of getting this particular job done. Plaintiff relies heavily on the Brown decision. Your Honor, I know that you were on that per curiam panel, and I certainly think . . . I think that case is distinguishable in that the relationship at issue in the Brown case was between OOSI, who was, as I understand the facts, and they were not greatly detailed as it was a per curiam opinion, but as I appreciated, OOSI is a boat broker who is hired by the operator, Williams, and hires CMR to provide the actual vessel. So in that case, OOSI is deemed to be the invitor of L&L. I think it's a sandblasting company hired by Williams, and I think the important point about that case . . . so it's a different factual relationship between the parties. You're not dealing with the operator. You're dealing with the actual boat company. This is more like blanks itself. Yes, I think it is. I think it is, and I . . . but I think it would be ironic in the Brown case, OOSI, who's a boat broker, who has no personnel on the job site and was never going to have personnel on the job site, is found to be the invitor, but yet W&T wants to say that it would not be the invitor under facts that are, I think, much more supportive of W&T's operational control of the activities of Tiger as it relates to . . . as it relates to this vessel. I spoke earlier about, Your Honors, about there being about ten cases in this circuit. Some are Fifth Circuit cases and some are Eastern District cases, but I think there's a body of about ten cases that address the invitee issue in an indemnity context. There are six that I think involve similar fact patterns where you have at issue the notion of a service company doing work on a vessel for an operator, whether the service company is the operator's invitee. In every case, each one of those six cases, which would include Alex v. Wildwell Control, Blanks v. Merco, East v. Premier, Lewis v. Glendale Drilling, Reno v. Rowan, and Terry v. Redstock, in each of those cases, the court found that the service company employee was an invitee of the operator, despite the fact that there was work done on the vessel. Similarly, there are three cases where the court analyzed the relationship of the operator to the vessel itself for purposes of determining whether the service company owed indemnity to the vessel. Those cases, and Judge Higginbotham, you were on the panel in St. Paul v. Halliburton back in 2006, which is one of those cases. In that case, LLOG contracted with Falcon Drilling. It also contracted with Halliburton. There was a Halliburton hand who was injured, and LLOG, who has a contract in that case with Halliburton, is trying to pass the indemnity through to Halliburton and is arguing that Falcon is its invitee. Even though the work in that case obviously is done on the Falcon vessel, the court finds that Falcon is the invitee of LLOG, and thus that Halliburton owes the indemnity. Other cases that dealt with that same fact pattern are Mills v. Zapata, where the vessel was actually the invitee in that case, and the district court case of Clayton Williams v. National Union. Brown v. Seymour . . . Yes, sorry, Judge. Do you agree that if we determine that it wasn't clearly erroneous to conclude that they were not invitee of Triton, that we do not need to address the contractual issue of whether this contract allows for circular indemnity or not? I do, Judge. I think that factual finding is well supported, and I think it makes moot any sort of speculation as to what would we do if the facts would show otherwise. If there are no other questions, thank you, Your Honors. Thank you, Counsel. Your Honors, just to respond to some of the statements, on the Blanks v. Murco case, which was, again, that was a case that had an allocation provision in it about which group the invitee would go into. But in that case, A&R was the operator, the oil company. A&R contracted with Murco Drilling to drill a well. A&R then contracted with Consolidated, which was to do the mud-logging work. And a Murco guy says, hey, can you help me move a piece of pipe? And he does it, and he gets hurt. And so then A&R resists the indemnity demand and says, hey, because he went and helped this Murco drilling hand move a piece of pipe, he's really Murco's invitee. Well, if Murco had said, hey, we're not going to go back on the job unless you provide us people to help, that would be like our case. That's why that case is apples and oranges. Also, the Brown case was mentioned. And in that case, OOSI had time-chartered the vessel from CMR. And then OOSI turned that vessel over to Williams, the oil company, to use it for sandblasting operations. And OOSI was found to be the invitor. Why? Because it had provided the vessel to Williams. Williams used it for sandblasting operations. And as the Court said, OOSI extended an implied invitation. And here it goes a little bit farther. Or, at the very least, did not countermand Williams' invitation to L&L to go on the vessel. And because of that, OOSI was deemed an invitor. We'll compare that to what we have here. Triton says, I'm not doing the work unless we have additional help. We provide it. Tiger's not getting on the boat unless they put him on the boat and okay it. It's exactly what we have here. And I guess there's nothing else I can say on that point. Okay. Just the last point I'd like to make is, as I said earlier, cases, the Blanks case we just discussed, that had the group allocation provision, which contemplates the reality that you can have an individual be the invitee of multiple invitors. That those contracts, they had an allocation provision. This one didn't. And in terms of whether or not Triton was an invitor, the factual findings by the District Court that resulted in him saying as an afterthought that Triton was not an invitor, was that the work of Tiger was of no benefit to Triton because he had gone and done this other job. And, you know, he did not say that the work that they did on site was not a benefit. He just said it doesn't matter because they could have gone on another job. Thank you, counsel. Thank you. That will conclude the arguments for today.